O’MALLEY, Circuit Judge,
dissenting.
For the reasons explained in my concurrence in Lombardi v. Secretary of Health & Human Services, 656 F.3d 1343, 1356 (Fed.Cir.2011), I continue to question whether our decision in Broekelschen v. Secretary of Health & Human Services, 618 F.3d 1339 (Fed.Cir.2010) represents an appropriate extension of our prior holdings. I do not dissent here on those grounds, however, or merely to repeat those concerns. I dissent here because the Special Master, and now the majority, incorrectly apply Broekelschen to this case and, in doing so, further erode what is left of this court’s precedential holding in Althen v. Secretary of Health & Human Services, 418 F.3d 1274 (Fed.Cir.2005). If this court wishes to abandon the burden shifting framework Althen describes — and thereby increase the hurdles Vaccine Act Claimants must overcome — it should do so expressly and en banc. Instead, we have condemned Althen to a tortured end by continuing to endorse Special Masters’ concerted efforts to narrow its application. I can not endorse such a cause, particularly on the record here.
Ms. Hibbard’s case presents what should have been a straightforward application of Althen, where once Ms. Hibbard put forward a prima facie showing of causation, the burden should have shifted to the respondent to establish an alternative cause for her injury. As explained below, that is not the methodology the Special Master employed in finding against Ms. Hibbard on her Vaccine Act claim and is not the methodology to which the majority now defers, however. Putting questions of methodology aside, moreover, I believe the Special Master’s finding that Ms. Hibbard did not suffer from an autonomic neuropa-thy to be arbitrary and capricious.
I.
In Althen, this court explained that a claimant seeking compensation for an off-Table injury must show that the “vaccination caused her malady.” 418 F.3d at 1278. Specifically, the court set forth the following three-part test for causation:
[The petitioner’s] burden is to show by preponderant evidence that the vaccination brought about her injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.
Id. By broadly defining what constitutes sufficient preponderant evidence of causation, this framework represents a balance between providing compensation to an injured claimant and permitting the government an opportunity to demonstrate that the claimant’s injury is due to factors unrelated to the vaccine. Id. Because Ms. Hib-bard established a prima facie case for causation, the burden should have shifted to the government to identify an alterna- *1370 five, more likely, cause of Ms. Hibbard’s dysautonomia.
In Broekelschen, the court addressed a scenario in which the parties contested the existence and nature of claimant’s injury. 618 F.3d at 1848. Specifically, the parties disputed whether Dr. Broekelschen, the petitioner, suffered from transverse myelitis or anterior spinal artery syndrome. Id. While the two different injuries are associated with the symptoms presented by Dr. Broekelschen, the underlying cause of each injury is materially different, and it was undisputed that only transverse myelitis is arguably related to the flu vaccine. Id. at 1346. Therefore, “the question of causation turn[ed] on which injury Dr. Broekel-schen suffered ... [and] it was appropriate in this case for the special master to first determine which injury was best supported by the evidence presented in the record before applying the Althen test.... ” Id. (emphasis added). The majority here finds similarity between Ms. Hibbard’s claim and that made in Broekel-schen and sanctions the Broekelschen approach, claiming “it was not error for the special master to focus first on whether she actually had the injury that she claims was caused by the vaccine before addressing the question whether the vaccine actually caused that injury in her case.” Majority at 1365.
But no such dispute exists with respect to the injury claimed by Ms. Hibbard. The majority’s analysis, like the Special Master’s, focuses entirely on questions of causation rather than injury. All parties — and the Special Master and court below — agree that Ms. Hibbard suffers from dysautonomia. They differ only with respect to the cause of the dysautonomia. Ms. Hibbard, and her expert, Dr. Thomas Morgan, contend that the flu vaccine caused her to suffer postural orthostatic tachycardia syndrome (“POTS”), a limited form of autonomic neuropathy, which manifested itself as dysautonomia. The respondent, and its expert, Dr. Vinay Chau-dhry, argue that Ms. Hibbard cannot prove by a preponderance of the evidence that she suffered an autonomic neuropa-thy, and, therefore, can not confirm the cause of her dysautonomia. The respondent notes that other possible causes of dysautonomia exist, but makes no effort to connect any of the alternative causes to Ms. Hibbard. Specifically, Dr. Chaudhry testified that he does not know the cause of Ms. Hibbard’s dysautonomia. Unlike the “unusual” case in Broekelschen, where “the exact injury and its nature — inflammatory response or vascular event — is in dispute, and, more importantly, the causation question turns on the determination of the injury,” no alternative theory of causation was presented here and no alternative injury or diagnoses other than dysautono-mia is in play. Broekelschen, 618 F.3d at 1349.
Even accepting it as true, the contention that Ms. Hibbard’s autonomic neuropathy “was a necessary component of her theory of vaccine-induced injury” does not give license to either the Special Master, or this court, to sidestep the inquiry that we have endorsed in Althen. The majority inappropriately conflates an element within the medical causation theory with the injury itself, and it is exactly this focus on causation that Althen’s burden shifting approach was designed to prevent. The danger of permitting a Special Master to circumvent Althen is apparent on this record. By characterizing his determination with respect to causation as a predicate factual finding, the Special Master effectively avoided both the appropriate burden of proof and the relevant standard of review.
*1371 The majority is correct that Ms. Hib-bard has not presented definitive confirmation that she suffered an autonomic neuropathy, or that the flu vaccine caused her dysautonomia, but that is not what Althen or the Vaccine Act asks of a petitioner. See Althen, 418 F.3d at 1279-1280. As Althen explains, a petitioner makes his or her prima facie case by satisfying a three part test — namely showing a medical theory causally connecting the vaccination and the injury, a logical sequence of cause and effect that the vaccination was the reason for the injury, and a proximate temporal relationship between vaccination and injury — before returning the burden to the respondent to show causation by factors unrelated to the vaccine. Id. If the respondent then fails to meet that burden by a preponderance of the evidence, the petitioner has, under the Althen framework, necessarily made a proper showing of causation. Id. No further showing by the petitioner is necessary. Requiring that a petitioner show actual causation by a preponderance of the evidence not only eliminates the burden shifting mechanism contemplated by Althen but also renders meaningless the words “theory” and “logical sequence.” Simply put, nothing in Althen — nor in the Vaccine Act itself — requires showing actual causation by a preponderance of the evidence; satisfaction of the three prongs is sufficient absent rebuttal by the government.
It is undisputed that, on this record, the failure to place the burden on the government to establish an alternative cause for Ms. Hibbard’s injury was determinative; the government proffered evidence of none. The failure here to apply correctly the test set forth in Althen, and the unwarranted extension of Broekelschen to this very different factual scenario, is legal error requiring reversal of the Special Master’s determination.
II.
Even accepting the majority’s decision to endorse the Special Master’s extension of Broekelschen well beyond its facts, I would still reverse the Special Master’s determination, finding it to be arbitrary and capricious on the evidence presented. We review factual findings of the Special Master with a high level of deference, but those findings must reflect a consideration of the relevant evidence of record, not be wholly implausible, and articulate a rational basis for the conclusion reached. See, e.g., Cedillo v. Sec’y of Health & Human Servs., 617 F.3d 1328, 1338 (Fed.Cir.2010); Hines v. Sec’y of the Dep’t of Health & Human Servs., 940 F.2d 1518, 1528 (Fed.Cir.1991). I cannot agree that the Special Master’s conclusion that Ms. Hibbard did not suffer an autonomic neuropathy is plausible.
For example, the record demonstrates that Ms. Hibbard received multiple diagnoses of autonomic neuropathy from her treating physicians. As the majority recognizes, after an evaluation in 2004, neurologist Dr. Louis Caplan concluded that Ms. Hibbard had “a postinfectious neuopa-thy with autonomic features.” Majority at 1359. Testing by Dr. Christopher Gibbons and Dr. Roy Freeman resulted in an abnormal result that led to a diagnosis of POTS. Majority at 1359. Specifically, the testing found “evidence of an exaggerated postural tachycardia ... [which] has been associated with a mild or early autonomic neuropathy.... ” A neurological examination by Dr. Russel Chin in 2005 noted these abnormal results and the previous diagnosis of POTS and autonomic neuropa-thy. While Dr. Chin was unable to confirm the prior diagnosis, he did state that many of the other possible causes for her symptoms had been ruled out. And in *1372 2007, Dr. Peter Novak, concluded that the results of his evaluation of Ms. Hibbard are suggestive of an autonomic neuropa-thy.
The Special Master, however, rejected this record evidence as inconclusive by noting that other doctors have “refrain[ed]” from making a diagnosis of autonomic neuropathy. He complains that one of the other treating physicians only identified autonomic neuropathy as a “possibility” and that he was “hesitant to confirm” it. And he further relies on an evaluation, from a doctor who performed later testing, stating that it was “unclear” the extent to which autonomic dysfunction was contributing to her systems. These equivocal statements do not, however, justify the conclusion that Ms. Hibbard does not have an autonomic neuropathy, especially when there is little indication that a conclusive diagnosis of autonomic neuropa-thy is generally given. In fact, it is only Dr. Chaudhry — and, by extension, the Special Master — who has reached this absolute conclusion.
The so called “objective tests” similarly provide little support for the Special Master’s determination that Ms. Hibbard does not have an autonomic neuropathy. As the majority notes, the Special Master relied “on the fact that the various objective tests for autonomic neuropathy that were conducted in Ms. Hibbard’s case were all negative.” Majority at 1367. But this determination misrepresents the significance of the tests, statements made by Ms. Hibbard’s expert, and statements made by the respondent’s expert. In fact, the majority acknowledges a sentence later that not all of Ms. Hibbard’s test results were normal. Id. The Special Master ignored these abnormal test results, because, in his words, “Dr. Morgan agreed that Ms. Hib-bard did not have any objective signs for a neuropathy.” Dr. Morgan does not, however, make the concessions that the Special Master attributes to him. He testified that he agrees that the tests performed had “mostly” normal results — excluding the abnormal results — but that statement does not support the Special Master’s leap to “no objective signs.” Dr. Morgan did testify that he agrees that Dr. Chaudhry’s report states that there are no objective signs of Ms. Hibbard having a peripheral neuropathy. But in the question and answer immediately following that statement, Dr. Morgan clarified that he believes Ms. Hibbard has a case of autonomic neuropa-thy without peripheral involvement.
The Special Master, moreover, applied an unwarranted significance to those results. Nowhere does Dr. Chaudhry opine that the objective tests are conclusive for diagnosing an autonomic neuropathy. In fact, all evidence points to the fact that the tests do not reliably disprove the existence of autonomic neuropathy, despite the fact that they offer “objective” outputs. Dr. Chaudhry admitted that there is a possibility Ms. Hibbard has mild neuropathy, failed to provide any alternative diagnosis for Ms. Hibbard’s POTS or dysautonomia, and testified that he actually had ruled out many of the alternative causes for Ms. Hibbard’s POTS. Dr. Morgan’s testimony on this topic is enlightening:
Q: And, Doctor, having employed that method, you indicated are there other diseases associated with it, in Ms. Hib-bard’s case were there any other causes found for her dysautonomia?
A: There were not.
Q: What tests did they do in May to rule out dysautonomia?
*1373 A: Tests don’t make the diagnosis. All right? Tests help support a diagnosis. If it was that easy, you don’t need doctors, just plug it into the computer, spit it out and you’ve got your diagnosis. So, there were no tests and they wouldn’t necessarily drive the diagnosis, but, more importantly, there’s probably no need to do those tests.
A169; A246.
The error in over-reliance on these objective tests is amply seen in the Special Master’s — and the majority’s — treatment of the Mayo Clinic study introduced by Ms. Hibbard. In that study, researchers concluded that a neuropathic basis existed for at least half of the cases of POTS they examined, which supported their initial postulate that POTS is a limited autonomic neuropathy. Here, all parties agree that Ms. Hibbard has POTS. They disagree only as to the significance of this finding with respect to a conclusion of autonomic neuropathy. Ms. Hibbard contends that the Mayo Clinic study shows that her POTS is indicative of an autonomic neuro-pathy. The Special Master, in contrast, agreed with the respondent’s view that Ms. Hibbard’s predominantly normal test results support a conclusion that she is not in the approximately 50 percent of all POTS patients that have a limited form of autonomic neuropathy.
The majority’s acceptance of the respondent’s position suffers from the same flaw as the Special Master’s before it. Ms. Hibbard does not dispute that causes other than neuropathy exist for POTS, but, as Dr. Chaudhry testified, no other cause for Ms. Hibbard’s POTS was identified and many of the possible alternative causes were expressly ruled out. As such, the likelihood that Ms. Hibbard’s POTS was caused by a neuropathy is actually significantly greater than the 50 percent likelihood trumpeted by the majority. More importantly, the lack of abnormal test results provides almost no support for the conclusion that Ms. Hib-bard is not part of the 50 percent of people whose autonomic neuropathy caused their POTS. In the Mayo Clinic study, 90.8 percent of the participants exhibited predominantly normal results in response to tests similar to the ones performed on Ms. Hibbard. Therefore, even assuming all of the patients that had abnormal results suffered from autonomic neuropathy, over 80 percent of the participants in the study identified as having POTS and autonomic neuropathy would have had to exhibit predominantly normal results to the “objective” tests relied on so heavily by the special master.
I agree that a Special Master’s factual findings are accorded deference, but in light of the great evidence to the contrary, I must conclude that the Special Master’s determination that Ms. Hibbard did not suffer an autonomic neuropathy was arbitrary and capricious.
III.
Based on the record before us, I think it clear that Ms. Hibbard has put forward a prima facie case under Althen that the administered flu vaccine caused her dysau-tonomia. The Special Master characterized Dr. Morgan’s medical theory as “poorly supported,” but the respondent appears to present no real challenge to Ms. Hib-bard’s satisfaction of the first Althen prong. Rather, the respondent focused on whether Ms. Hibbard affirmatively established that she suffered from one of the links in the causal chain leading to her injury. Regardless of the respondent’s attack on the adequacy of the evidence of *1374 autonomic neuropathy, the respondent cannot dispute that the evidence establishes a logical sequence of cause and effect. I therefore see no legitimate dispute as to Ms. Hibbard’s satisfaction of the second Althen prong. Finally, as the majority notes, the respondent expressly conceded that Ms. Hibbard’s claim satisfies the temporal prong. Majority at 1362. Having presented a prima facie case of causation, the burden, in accordance with Althen, appropriately shifts to the respondent to demonstrate a likely alternative cause for Ms. Hibbard’s injury.[1] As Ms. Hibbard contends, the respondent failed to put forward any alternative cause, let alone a likely one. Dr. Chaudhry’s testimony fails to back any alternative theory that would explain Ms. Hibbard’s injury. As such, reversal of the determination of the Special Master and entry of judgment for the petitioner is appropriate.
Separately, and in addition, I would find that the Special Master erred in determining that Ms. Hibbard did not establish that she suffered an autonomic neuropathy by a preponderance of the evidence. This error standing alone warrants reversal.

. If the majority and the Special Master were correct that, in addition to the Althen showing, a Vaccine Act claimant must also separately establish each link in the causal chain by a preponderance of the evidence, there would be no burden left to shift back to the government.